UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH TRAVERS, LAWRENCE McLARTY, RANDOLPH TRIM, EZEQUIAS MARTINS PAZ, JING WEI, ANDREW STONE, ABDELATI ENNAKORI, RACHID FAIZ, HANNAH MORRIS, MOISES JACKSON, KEVIN McDOWELL, and all others similarly situated,<br>        Plaintiffs,<br><br>v.<br><br>JETBLUE AIRWAYS CORPORATION, and FLIGHT SERVICES AND SYSTEMS, INC.<br>        Defendants. | CIVIL ACTION NO. 08-10730-GAO |

## RULE 56.1 STATEMENT OF MATERIAL FACTS OF DEFENDANT FLIGHT SERVICES AND SYSTEMS, INC.

Pursuant to Local Rule 56.1, Defendant Flight Services and Systems, Inc. ("FSS") hereby submits this statement of material facts in support of its motion, pursuant to Fed. R. Civ. P. 56, for summary judgment ("Motion") seeking judgment in its favor on all remaining claims of all remaining plaintiffs who are suing FSS.[1]

## FACTS

1.  FSS provides aviation services for in various locations. (See Deposition of Robert Weitzel ("Weitzel Dep.") at 9)

---

[1]  By unopposed motion, granted on July 8, 2010, plaintiff Moises Jackson was dismissed as a plaintiff for failing to appear for his deposition on three occasions. (See Electronic Order granting DE-117) The parties stipulated to the dismissal of Ezequias Martins Paz on July 10, 2010. (DE-118) Plaintiff Kevin McDowell is not employed by FSS (see DE-39, ¶ 14) and, accordingly, has no claims against FSS.

2.      Superior Aircraft Services ("Superior") used to contract with JetBlue to provide curbside skycap services in Boston (and elsewhere). (See Deposition of Robert Nichols ("Nichols Dep.") at 24-25)

3.      In June 2006, FSS replaced Superior as the provider of curbside skycap services for JetBlue. (See id. at 24)

4.      There are approximately 40 FSS employees working for JetBlue at Logan Airport in Boston, serving in various different positions, including skycaps.  (See id. at 23)

5.      On or about February 5, 2008, JetBlue began a program of charging $2 per bag for curbside baggage check-in. (See Deposition of Andrew Stone ("Stone Dep.") at 57)

6.      In this program, FSS sends a monthly record to JetBlue of the number of bags its skycaps checked that month and pays JetBlue $2 per bag collected. (See DE-106-3, at ¶ 7)

7.      FSS retains no portion of the $2 curbside baggage charge. (Id.; see also Side Letter #1, JetBlue Airways Corp. and Flight Services & Systems, Inc. (Feb. 5, 2008), ¶ 1.a–.c)

8.      FSS skycaps are responsible for collecting the $2 charge. (See DE-106-3, at ¶ 7)

9.      Initially, for approximately one year, the skycaps collected the $2 bag fee and, with each transaction, put a sticker on a sheet of paper to reflect the number of bags checked and, thereby, the number of $2 bag fees collected.  (See Stone Dep. at 57)

10.     Then, beginning in early 2009 and lasting for approximately one year, FSS began utilizing handheld "PDAs" to process the transactions, which enabled the skycaps to collect the $2 charge via a passenger's credit card.  (See id. at 15-16, 58)

11.     In approximately February 2010, FSS skycaps then began using computer terminals, known as the "Sabre" system, to process the $2 bag fee transactions. (See id. at 15)

2

12.     FSS pays each of the plaintiffs the tip credit minimum wage in Massachusetts, which is $2.63 per hour. (See Weitzel Dep. at 13)

13.     The plaintiffs made tips as well.  (See Paragraphs 24, 26 n.2, 28-29, 39, 64-66, 73, 86, 95, *infra*; see also FSS Handbook Excerpt, at 25)

14.     FSS requires skycap employees to accurately report all of their tips to FSS.  (See Nichols Dep. at 36-37; Deposition of Hannah Morris ("Morris Dep.") at 25, 35; see also FSS Handbook Excerpt, at 25 ("It is the policy of FSS in compliance with the Department of Wage and Hour and the Internal Revenue Department that all tips that you receive are claimed on a tip reporting form.")

15.     FSS requires skycap employees to accurately report all of their tips using basic procedures – initially a weekly reporting system and then a daily reporting system.  (See Nichols Dep. at 36-39 (explaining that FSS trains skycaps to report their tips in "a Chronos system" in which they "have to put their finger tip on it to prove it's them and they enter their tip amount" and that FSS has a procedure for following up with skycaps who fail to do so daily); Paragraphs 26 n.2, 30, 40, 53, 63, 82, *infra*; see also FSS Handbook Excerpt, at 25 (stating that "disciplinary action up to and including termination" may result from a tipped employee's failure to record all tips on tip reporting form).

16.     FSS also requires that skycaps collect the $2 curbside baggage fee from each customer who checks bags at the curb. (See Morris Dep. at 31; Wei Dep. at 11, 51-53; Ennakori Dep. at 29-31; Deposition of Laurence McLarty ("McLarty Dep.") at 17-18; Deposition of Rachid Faiz ("Faiz Dep.") at 12; Travers Dep." at 72; Trim Dep. at 38-42 59;  Paz Dep. at 21-23; see also Weitzel Dep. at 51 (explaining JetBlue requires remittance of $2 fee from FSS for every bag skycaps check))

17.     Plaintiffs testified to knowing they are not supposed to check any bags for which a customer has not paid the fee, but rather send the customer inside to check his/her bags. (See Paragraphs 25, 26 n.2, 58, 69, 80, 100, *infra*)

18.     Plaintiffs also testified to knowing that if they have already started the transaction, and the customer does not pay the fee, they are supposed to void the transaction and send the customer inside to check bags. (See Paragraphs 26 n.2, 71, 100, *infra*)

19.     Plaintiffs testified that even if they still allowed the customer to check his/her bags at curbside and did not void the transaction, they could inform JetBlue and get a waiver from having to pay the bag fee for the customer. (See Paragraphs 43-44, 92, 90, 98, 100, *infra*)

20.     Despite plaintiffs' awareness of the procedures set forth in Paragraphs 17-19 *supra*, on rare occasions, plaintiffs did not follow any of them and paid the customer's bag fee for the customer. (See Paragraphs 26 n.2, 46-48, 57-58, 70, 79, 90-91, 97-98, 99-100, *infra*)

21.     Where plaintiffs paid the customer's bag fee for the customer, they did so voluntarily and without informing FSS or JetBlue. (See Paragraphs 26 n.2, 48-49, 59, 61, 71, 80, 92-93, 98, 99-100, *infra*)

**Plaintiff Hannah Morris**

22.     Plaintiff Hannah Morris ("Morris") was previously a Superior skycap, and she became an FSS skycap in June 2006. (See Morris Dep. at 9-10)

23.     Morris is aware of FSS's policy that skycaps declare all of their tips and Morris testified she abides by that policy. (Id. at 35)

24.     Morris testified that, with her tips included, she always made the minimum wage:

Q.     And with those tips your 2.63 an hour plus tips is supposed to put you above the minimum wage, right?
A.     Most of the time.

1076748.2

Q.   Can you think of any one-week period where you didn't earn minimum wage?

A.   Not the entire week. If you average the tips for the whole week, it maintains the minimum wage?

Q.   So over the course of a week you always earn the minimum wage?

A.   Yes, sir.

Q.   And that's with FSS?

A.   Yes, sir.

(Id. at 13; see also id. at 33-36)

25.   Morris testified she always collects the baggage charge from customers if the customer checks bags at curbside:

Q.   All right. Is that generally the case for you when a check a bag at curbisde, you always collect a fee?

A.   Yes, sir.

Q.   Have you ever not collected a fee when you've checked a bag at curbside?

A.   No, sir, the system automatically charges the bags fee, and its mandatory.

Q.   And you've never let someone pass without paying you the fee?

A.   No, sir. If they don't have the money, I'll help them inside to the ticket counter.

Q.   Okay. And you don't check their bags in?

A.   I will not check their bags. I will assist them inside with their luggage.

(Id. at 31-32)

26.   Morris testified she does not even want to sue FSS:

Q.   Ms. Morris, I just want to get your understanding about what this case is about for you.

A.   What it is to me?

Q.   Yes.

A.   Well, we feel like we work outside, and we're the ones that are doing the work, and for the airlines to take the $2.00 a bag, we feel like that's a slight rip-off.

Q.   Okay. Is that your full understanding of what this case is about for you?
      MR. CASAVANT: Objection.

A.   It's about justice, about that. We maintain what we – we get what we work for.

Q.   Do you have any complaint against FSS?

A.   No, sir, it's not them.

Q.   So is it fair to say that your claims in this case not brought against FSS?
      MR. CASAVANT: Objection.

A.   No, I have no problem with the company itself.  It's just that we feel like they shouldn't charge a $2.00 bag fee outside.

Q.   Do you blame FSS for charging that $2.00 bag fee?

A.   It wasn't their decision.

Q.   And that's your sole understanding of what your claims are about here?

A.   Yes, sir.

Q.   So if you were asked to dismiss FSS as a defendant from your case would you do that?

MR. CASAVANT:  Objection.

A.   If they could not be involved?

Q.   You would be amendable to that?

MR. CASAVANT:  Objection.

A.   Yeah.

(<u>Id.</u> at 36-38)[2]

### Plaintiff Andrew Stone

27.     Plaintiff Andrew Stone ("Stone") was a Superior skycap starting in November 2004 and became an FSS skycap in June 2006. (<u>See</u> Stone Dep. at 6-7)

28.     On a good day, Stone testified he earns between $175 and $200 per 8-hour shift in tips as a skycap. (<u>Id.</u> at 13)

29.     During an average 8-hour shift as a skycap, Stone testified he earns between $100 and $125 in tips. (<u>Id.</u>)

30.     Stone testified that FSS had required protocols in place for skycaps to report their tips:

---

[2]     As this Court is aware, the parties already stipulated to the dismissal of plaintiff Ezequias Paz ("Paz"). (DE-118)  For what it is worth, Paz testified that he makes $80-$100 per day in tips. (<u>See</u> Paz Dep., at 9, 24)  Paz also testified that he had been informed of his "obligation to report [his] tips daily and accurately in the KRONOS time clock while punching out." (<u>Id.</u> at 35)  He could not think of any week he did not earn the minimum wage. (<u>Id.</u> at 24-26)  He further testified that he would always report the minimum amount to show that he made the minimum wage, <u>but he actually made more than he reported</u>. (<u>Id.</u> at 61-62, 65-66)  Paz also testified he is aware of the corporate policy that, if the customer does not pay the baggage fee, the transaction can be voided and the customer sent inside. (<u>Id.</u> at 21, 23)  Paz testified that he's followed that process "a lot of times" and where he did not follow it, he did so as a courtesy to the passenger, and voluntarily. (<u>Id.</u> at 22-23)

> Q.   How would you account for the tips that were in the drawer, the cash that was left over in the drawer as tips?
>
> A.   I don't understand.
>
> Q.   Did you have to report that in any way?
>
> A.   We would have to do a tip report. It used to be weekly. But since we got the new time clock, which scans our fingerprint, we were told to do it daily.

(Id. at 16)

31.   Stone testified he may not have reported all of his tips:

> Q.   We have now looked at records from February of 2008 until, on Page 19250, September of 2008. And yet in that more than 6-month, almost 7-month period,  we can't identify you making $100 to $125 on average in tips in any pay period?
>
> A.   Right.
>
> Q.   So that might mean that you were regularly not reporting all of the tips that you made to FSS?
>
> A.   It also might mean I was not making $125 per day each day.
>
> Q.   You told me that was the average. That's your testimony, Andrew.
>
> A.   Yes.
>
> Q.   That's your testimony. You said it under oath here earlier today. Do you understand that?
>
> A.   Yes, sir.
>
> Q.   So this might mean that in this 7 months, if that's your testimony, that you weren't reporting all of your tips to FSS in this time period, right?
>
> A.   It could mean that.

(Id. at 39-40)

32.   Stone initially stated that he could not think of a week in which he did not make the minimum wage. (Id. at 47)  Stone later testified that there was a one-week period in either August or September of 2009 for which someone told him he did not make the minimum wage. (Id. at 48-49)  Stone also stated that he "assumes" there were 8-10 times prior to that in which someone told him he did not make the minimum wage. (Id. at 50)

33.   Stone stated that it was possible that he could have failed to report all of his tips in any of the weeks in which he may not have reported enough tips to make the minimum wage:

7

> Q.    Could that have happened in any of the weeks that you said you didn't
>        report enough to make the minimum wage?
> A.    It could have happened, but I don't think so.
> Q.    It could have been the same week?
> A.    It could have been.
> Q.    You just don't know?
> A.    Right. I don't remember exactly.

(Id. at 78-79)

34.     Stone testified that, for the period during which stickers were used to keep track

of bag fees collected, he could not think of any time that he did not collect the $2 bag fee. (Id.. at

57)

35.     Stone also testified that, for the period during which PDAs were used to collect

bag fees, he could not think of any time that he did not collect the $2 bag fee from a customer.

(Id. at 59)

36.     Stone also testified that, for the period during which the Sabre system has been

utilized, he could not think of any time that he did not collect the $2 bag fee from a customer.

(Id. at 60)

### Plaintiff Jing Wei

37.     Wei began working as a skycap in approximately 2003.  (Wei Dep. at 6)

38.     Wei works four 8-hour shifts for FSS, or a total of 32 hours. (Wei Dep. at 8, 32)

39.     Wei testified that he always reported $80 in tips per shift, and that was an average

number. (Id. at 24-27)

40.     Wei testified that FSS had required protocols in place for skycaps to report their

tips:

> Q.    You've been punching it in every day for how long -- punching in your
>        tips every day for how long?
> A.    About a year.
> Q.    What did you do before that?

A.   Before they would just do the tip sheet.  The tip sheet.
Q.   Would you do that every day?
A.   No. Every week. I believe Saturday or Sunday's the last day. I believe Saturday's the last day you figure it out.

(Id. at 24)

41.   Wei stated that, at the end of the week, using that average number, it would be "very close" to what he actually made in tips. (Id. at 33)

42.   Wei was questioned about whether he made the minimum wage, and testified:

Q.   Okay.  Can you think of any time where you didn't make the minimum wage?
A.   It's just difficult to tell.  So what do you mean the time?
Q.   Well, I guess over the course of a week, alright –
A.   Hm Hm?
Q.   -- you worked 32 hours a week for FSS?
A.   Hm Hm.
Q.   So, you know, at the end of that week you're supposed to have somewhere in the neighborhood of anywhere from whatever the minimum wage was – say it's been in the range of 150 to $200 for those 32 hours, maybe a little bit more –
A.   Hm Hm.
Q.   -- can you think of any week where you didn't make at least $200?
     MR. CASAVANT:  Objection.
A.   No.

(Id. at 21-22)

43.   Wei acknowledged that the corporate policy is to collect the $2 every time someone attempted to check their bags at curbside, and if that fails to happen, to inform the dispatcher that the fee was not collected.  (Id. at 51-53)

44.   Wei has, in fact, seen his fellow skycaps do that. (Id. at 53; see also stipulation at 50 regarding answers of Wei)

45.   FSS records reflect that Wei checked 20,520 bags at curbside during the period February 1, 2009 through January 31, 2010.  (See Wei Skycap Activity Report)

1076748.2

46.     Wei can think of two to four times that he did not collect $2 per bag from a

customer and he had to use money from his tips to pay for a shortage in the bag fees he collected.

(Wei Dep. at 39, 46)

47.     One or two times, this occurred with a handicapped customer and one or two

times, it occurred with an elderly customer. (Id. at 41, 45)

48.     Wei knew that he could have required these customers to pay the bag charge, but

he chose not to do that:

> Q.     Well, can't you ask – follow them and tell them that's the policy, and they
>        need to pay the money?
> A.     If, you know, regular people – regular customers, yes we do.  But
>        sometimes for those handicapped – you know, those elderly, I just pay for
>        them.
> Q.     So you made a personal decision not to track the person down because
>        they were handicapped?
> A.     I pay – I take – I mean I take the money out from my pocket to for them,
>        yes.
> Q.     And that was your personal decision?
> A.     That's my personal decision.

(Id. at 44; see also id. at 45)

49.     As Wei conceded, no one from FSS ever directed him to do that and he never told

anyone from FSS or JetBlue that he had done that. (Id. at 45, 47)

50.     Moreover, Wei testified:

> Q.     Are you making a claim in this case for having to pay $2 yourself in those
>        situations?
> A.     No.

(Wei Dep. at 48)

51.     Wei testified that he is not seeking to hold FSS and JetBlue responsible for having

made this personal decision to let the handicapped person and the elderly persons go without

charging them. (Id. at 48-49)

**Plaintiff Randolph Trim**

52.     Plaintiff Randolph Trim ("Trim") began working as a skycap for FSS in 2006.

(See Trim Dep. at 9)

53.     Trim stated that he is aware that FSS policy requires he accurately report his tips

at the end of every shift:

> Q.     Are you aware that your employer, FSS, has a policy of reporting your tips
>        accurately at the end of every shift?
> A.     Yes.
> Q.     Do you abide by that policy?
> A.     Yes, I do.  Sometimes.
> Q.     You are telling me you don't.  You are telling me you don't report your
>        tips accurately at the end of every shift?
> A.     As I said, when I finish working, I just want to go home and relax.
> Q.     You know you have an obligation to report all of your tips to your
>        employer, right?
> A.     Yes.

(Id. at 26-27)

54.     Trim stated that he does not count his tips before he goes home, and he hands the

tip money to his wife. (Id. at 26)

55.     Trim stated that he never asks his wife how much he made in tips after she counts

the money and she never tells him what he makes after she counts the money. (Id. at 28-29)

56.     FSS records reflect that Trim checked 19,210 bags at curbside during the period

February 1, 2009 through January 31, 2010.  (See Trim Skycap Activity Report)

57.     Trim stated that after the $2 charge was in effect, there were times when he would

pay for passengers' $2 bag fees. (Id. at 38-40)

58.     Trim was aware of the corporate policy of requiring a customer to check his/her

bags inside if they did not have the curbside baggage fee:

> Q.     Let's talk about the sticker time frame.  During that sticker time frame,
>        where you were collecting money per bag for JetBlue, did there ever come

a time – was there ever a time where you did not collect a bag fee but yet gave a sticker to the customer?

A.   Yes.

Q.   When was that?

A.   Within the period that.  I couldn't remember exactly, because a little old lady comes up, and she was, like, okay – it happened on several occasions.

Q.   With the same old lady?

A.   No.  Several.

Q.   Several different old ladies?

A.   Yes.  They say, I need to check in.  When you check them in and you tell them it is $2 a bag, they are like, I don't have any money.  Okay.  That's fine.  I will put it in for you.

Q.   What were you supposed to do?

A.   Send them inside to check in.

Q.   You weren't supposed to give them a sticker?

A.   No.  I wasn't supposed to check the bags because the stickers are being counted.

(Id. at 38-40)

59.   Trim further testified:

Q.   But you knew what you were supposed to do, which was to send them inside?

A.   Yes

Q.   You chose not to do that?

A.   Yes.

Q.   Did you tell that to your employer that you were doing that?

A.   No.

(Id. at 41-42)

60.   Trim testified that if a "college kid" claims he/she cannot pay the bag fee, he sends him/her inside, while for old ladies, he feels sympathy and pays the fee for them. (Id. at 40)

61.   Trim stated that he is not looking to hold FSS responsible for his personal decision not to require the college kid and old ladies to pay the bag fee. (Id. at 62-63)

1076748.2

### Plaintiff Abdelati Ennakori

62.     Plaintiff Abdelati Ennakori ("Ennakori") was previously a Superior skycap and became an FSS skycap in June 2006. (See Ennakori Dep. at 7-11)

63.     Ennakori testified that FSS had required protocols in place for skycaps to report their tips:

> Q.     Do you have to write down your tips that you get, you know, every day?
> A.     We used to before, a long time ago we used to but they have changed.
> Q.     Now, what do you do?
> A.     Now, we just put it in the clock when you clock out.
> Q.     You put them in the computer?
> A.     You clock out, not the computer.  You have an option when you sign out, we put and then they ask you to enter the tip.

(Id. at 49)

64.     Ennakori only reported the average amount of tips he made each day, but did not include the exact amount. (Ennakori Dep. at 50, 52, 61)

65.     Also, Ennakori buys coffee and lunch from his tip money, costing approximately $5-$10 a day, and he does not include that in the tips he records at the end of each shift. (Id. at 55-58)

66.     Ennakori thinks he made the minimum wage at all times:

> Q.     So, again, let's get back to my original question which was, when you count all of the tip money that you actually get from passengers whose bags you're checking, when you add that together over the course of a week, plus the money that you receive from FSS every hour, you make minimum wage, right?
> MR. CASAVANT:  Objection.
> A.     I think it would be, yeah.
> Q.     You think yes?
> A.     Yes.

(Ennakori Dep. at 59-60)

1076748.2

67.    Ennakori cannot identify any week where he did not make the minimum wage.

(Id. at 60)

68.    FSS records reflect that Ennakori checked 25,068 bags at curbside during the period February 1, 2009 through January 31, 2010.  (See Ennakori Skycap Activity Report)

69.    Ennakori understands that it is FSS's policy that if someone is unwilling or unable to pay the curbside baggage fee, they are supposed to send the person inside to check his/her bags:

> Q.    . . . . If a person tells you, I don't have any money to pay, do you tell them to go inside?
> A.    Yes.
> Q.    Yes?
> A.    Yes.
> Q.    Do you do that often?
> A.    Every time when they ask me, if they don't have money –
> Q.    You send them inside?
> A.    Yes.

(Ennakori Dep. at 29-30)

> Q.    You know that you're supposed to send the people inside; is that right?  If they don't have any money, you're supposed to send them inside?
> A.    Yes, that's what I do if they don't have no money.
> Q.    If people don't have money to pay the bag fee, you send them inside, right?
> A.    Yes.
> Q.    Is that what you do?  Do you usually send people who don't have money to pay the bag fee inside?
> A.    Yeah, if they don't have no money, they go inside.
> Q.    Is that what you are supposed to do?
> A.    Yes.

(Ennakori Dep. at 30-31)

70.    Although he could not recall when they occurred, Ennakori could only think of two situations – one with an old lady and one with a student – where he did not follow FSS's

policy and allowed the passenger to check bags at curbside without paying the fee. (Ennakori

Dep. at 32-33, 39)

71.     Ennakori testified he voluntarily did not require the student pay the bag fee

because he "felt sorry for him," voiding the transaction would have taken a long time, and there

was a line. (Id. at 35-36)  Ennakori testified he voluntarily did not require the old lady pay the

bag fee as a favor to her because he was "try[ing] to be nice." (Id. at 36-38)

### Plaintiff Rachid Faiz

72.     Plaintiff Rachid Faiz ("Faiz") began working as a skycap for FSS in 2004 or

2005.  (See Faiz Dep. at 6)

73.     Faiz testified that, on a normal, day he will make between $65 to $85 in tips (Id.

at 15)

74.     Faiz stated that he always makes the minimum wage and cannot think of any

week he did not make minimum wage. (Id. at 16, 17)

75.     Faiz stated that up until three weeks before the deposition, he had not accurately

reported his tips but had only reported the minimum in order to show he was making the

minimum wage:

> Q.     Do you always report all of your tips?
> MR. CASAVANT: Objection.
> A.     Well, I did, but you know, sometimes I report the minimum.
> Q.     So if I'm asking you do you always report all of your tips, are you saying no?
> A.     No, but if, sometimes I report 55, 65, I may make an extra $15, so I don't really --
> Q.     Okay.
> A.     Most recently I did report everything. The last three weeks I've reported everything.
> Q.     The last three weeks you've been reporting your tips?
> A.     Yes.
> Q.     And you weren't reporting your tips before that?

> MR. CASAVANT: Objection.
> A.    I did report them, but --
> Q.    You weren't reporting all your tips?
> A.    I report minimum that --
> Q.    Okay. So you would figure out the minimum you needed to make the minimum wage, and you would just put that down?
> MR. CASAVANT: Objection.
> A.    That's it, yes.

(Id. at 24)

76.    When asked why he did not report more than the minimum, Faiz replied: "Well, sometimes you take your lunch out of it, you take your coffee, and you just, you don't want to report that." (Id. at 25)

77.    Faiz stated that he makes $15-$20 more in tips that what he reports. (Id. at 29)

78.    FSS records reflect that Faiz checked 20,155 bags at curbside during the period February 1, 2009 through January 31, 2010.  (See Faiz Skycap Activity Report)

79.    Faiz stated that there have been four or five times, "about a year ago," in which he has not collected the bag fee (Faiz Dep. at 10-11), but he later narrowed these four or five times down to one to two times. (Id. at 20-22):

> A.    Sometimes a customer comes in, and he's like a regular customer of JetBlue. He comes in, like I said: Well, I don't have any cash on me. I say: That's fine, you can do it next week, whatever. He tells me: I'm flying next week, whatever.
> Q.    You'll collect the fee next week?
> A.    No. I do get a tip from him, he usually tip me, he usually give me a tip, but I don't insist of telling him you have to pay me or I can't check your bag. Like he's a regular customer for JetBlue. I don't treat him -- if he don't have, I don't have change, whatever, I say that's fine, whatever time. I'm here on these days.  He'll give it to me.
> Q.    And that's happened four or five times?
> A.    Yeah, four or five times.[3] It happened about twice with this customer, and it happened with like an old lady, that she doesn't have the money, and I

---

[3]    As noted before the quoted testimony above, Faiz later narrowed these occasions to 1-2 times. (Id. at 22)

1076748.2

> can't hold her in line and have her stand there. So I'll tell people: That's fine, you can go ahead.

(Faiz Dep. at 10-11)

80.     Faiz stated that it was his decision not to collect the fee from these customers and he did it for convenience in that it was easier to do that and avoid hassle of following corporate policy:

> Q.     And that was your own decision to do it?
> A.     My decision, yeah, depend on the case. I feel like a customer is not, you know,  you feel that your mom doesn't have the cash, like Spanish lady, she's old, doesn't speak English, and I'm not going to give her a hard time for $2 a bag because I already got the tag, and I'm now going to have to cancel that and send her inside the line, all this process.  It's just convenient for her to send her in and see you later.

(Id. at 12; see also id. at 18, 19-20, 20-21)

### **Plaintiff Joseph Travers**

81.     Plaintiff Joseph Travers ("Travers") began working as a skycap for FSS in February 2004. (See Travers Dep. at 17)

82.     Travers stated that FSS has a daily reporting procedure in place for skycaps to report their tips.  (Id. at 107-08)

83.     Travers testified that he would keep track of how many tips he earned throughout a shift in his head and would not write down the amount.  (Id. at 104-05)

84.     Travers stated that he might wait until the end of the week to record how many tips he received. (Id. at 105)

85.     He further testified there have been times in which Travers has forgotten to report his tips and, when reminded to report his tips, he does not know if he reported the exact amounts he earned. (Id. at 110-11, 113)

1076748.2

86.     Travers testified he could not identify any week when he did not make the

minimum wage:

> Q.     Okay. Well, can you think of any week --
> A.     No.
> Q.     -- where you didn't make the minimum wage?
> A.     There's been days but not -- not a week, no. But there's been days where like if it's a snowstorm and there's no -- nobody checking in and all the flights are canceled, we still work at the airport for 2.63 an hour. So, yes, there have been times where I made just 2.63 an hour and no tips for that day.
> Q.     And that's just a day. But over the course of a week you don't know whether you didn't make --
> A.     I probably didn't. So...
> Q.     But you can't name any?
> A.     Not off the top of my head, no. I can't recall at this time. So...
> Q.     Would there be any other reason other than a snowstorm that you might not
>     make --
> A.     Computers are down. JetBlue system failure with their computers.
> Q.     Any other reason?
> A.     No. We have enough volume at JetBlue to make up the difference.
> Q.     Okay. So snowstorm, computers would be the only reasons why you might not have the volume to make tips?
> A.     Yeah, that's usually -- yes, that's correct.

(Id. at 99-100)

87.     Travers stated that he remembered one time within the past year in which he was

told that he did not report enough tips for the week to make the minimum wage but he does not

remember exactly when this happened or how off his report of tips was. (Id. at 118-20)

88.     Travers stated that when he failed to report enough tips for the week to make the

minimum wage, the reason for this could have been that he didn't correctly approximate how

many tips he earned for that week:

> Q.     The reason could have been that you didn't put down -- the reason could have been a number of reasons --
> A.     Could have.
> Q.     -- including the fact you didn't approximate right when you wrote down your tips for that week?

|   |   |
|---|---|
| A. | It could have been, yes. |
| Q. | So simply putting down the right amount cured the problem? |
| A. | Yes. |

(Id. at 120-21)

89.     FSS records reflect that Travers checked 19,490 bags at curbside during the period February 1, 2009 through January 31, 2010.  (See Travers Skycap Activity Report)

90.     Travers testified about certain occasions of failing to collect the bag fee as follows:

|   |   |
|---|---|
| A. | It's happened a couple times. You know, a customer might walk off and not pay or -- you know, most of the time no. They usually pay. A couple times like maybe the credit card didn't go through or something.  So I'll give it to JetBlue so they can call the customer at the gate and get the money from them, and they'll put it in their system. |
| Q. | Okay. So let me just get this straight. Is it the number of times you've had to dip into your pocket to pay -- |
| A. | A couple times. Maybe twice. Three times maybe. It matters -- if my envelope's short, then I have to. A couple times I've gotten called that my envelope was short. So I had to pay out of my pocket. |
| Q. | So the total amount that you had to pay out of your pocket is it a fair statement it's been less than $10? |
| A. | Twenty bucks, yeah. |
| Q. | At most? |
| A. | Over a six-year period -- it's only been three years since it was $2 a bag. |
| Q. | But total under $20? |
| A. | Yeah, yeah. Not that much. |
| Q. | You don't know whether it's five cases, three cases? By that I mean to say whether it's occurred on five occasions -- |
| A. | It's happened a few times, yeah, you know, where a customer doesn't have the money. So I just pay it out of my pocket or something like that might happen. |

(Id. at 68-70; see also id. at 130)

91.     Travers could not remember clearly about situations where a customer did not pay the $2 bag fee, because the way the money is handled "it's hard to tell" (Id. at 67, 68-71, 130):

|   |   |
|---|---|
| Q. | So you don't know -- you wouldn't know whether or not the period in which you had to dip into your pocket was a period where your tips were abundant in your -- |

1076748.2

> A.   It's hard to tell if I'm dipping into my pocket because all my money goes into the same drawer. So there could be times where I'm dipping in my pocket and I might not even know it when I count it out at the end of the day if I made any mistakes or anything.

(Id. at 70-71)

92.   Travers recognized that he could have required every passenger to pay the bag fee or informed JetBlue if a passenger did not pay the bag fee in order to not have to pay the fee himself. (Id. at 150, 167).

93.   Travers stated that when he did not collect a baggage fee from a customer, but still allowed that customer to check bags at curbside, it was his own decision and not something FSS required. (Id. at 136)

> Q.   So there was no I guess corporate policy from FSS --
> A.   No.
> Q.   -- telling you to let the passenger go even though they hadn't paid you the $2?
> A.   No corporate policy, no.
> Q.   Okay. That was your personal decision?
> A.   That was my personal decision, yes.

(Id. at 136; see also id. at 167)

### Plaintiff Laurence McLarty

94.   Plaintiff Laurence McLarty ("McLarty") previously worked for Superior and has been an employee of FSS since June 2006 when FSS took over the contract to service JetBlue. (McLarty Dep. at 10-12)

95.   McLarty testified that he made $2.63 per hour plus tips and that he could not identify any time where he did not make the minimum wage. (Id. at 16-17)

96.   FSS records reflect that McLarty checked 9,146 bags at curbside during the period February 1, 2009 through January 31, 2010. (See McLarty Skycap Activity Report)

97.     McLarty claimed that there was an occasion that he checked a woman's bags without collecting a $2 fee, and he paid the $2 fee for her.[4] (Id. at 18, 27-28)  McLarty stated that, on this occasion, the woman supposedly started off by saying she wanted to pay by credit card, then decided to use cash, but then told McLarty she had no cash. (Id. at 19-20)  This was a woman in her 20's or 30's and she also supposedly told McLarty she did not have a credit card. (Id. at 20)  When McLarty's report came out at the end of the day, the report reflected that McLarty had initially put in that the $2 fee was charged by credit card, but since that was not the case, McLarty crossed it out and said that he had collected cash. (Id. at 21)

98.     McLarty testified that he could have explained this to his supervisor at FSS or the JetBlue supervisor and not had to pay the $2 charge himself, but, in his words, he did not do so because "it was only $2." (Id. at 28-29)

99.     McLarty claimed there were occasions when "older couples" would refuse to pay the $2 charge and 7-8 times where college students would complain they did not have money or a credit card to pay the charge and McLarty would pay the fee for them. (Id. at 30-32)  He did this voluntarily when he felt the passenger was sincere. (Id. at 31-32)

100.    As McLarty testified, on those occasions, "out of the kindness of his heart," he did not take advantage of the company policy and void the transaction or require the passengers to check their bags inside, but there were "countless" occasions he did follow that company policy:

> Q.     So each of those times where you let someone go without paying the fee were times where you could have gone and gotten an exception to coming up with the fee at the end of the shift that wasn't collected, right?
> A.     Yes.

---

[4]     McLarty gave lengthy testimony about this occasion and how it occurred when he was using a handheld PDA only to later testify that everything he said about that was inaccurate and incorrect.. (McLarty Dep. at 19-23)

Q.   But you didn't do that?

A.   No.

Q.   Why did you not do that?

A.   I didn't, okay?  Why did I not take it upon myself to –

Q.   Get the exception.

A.   I mean, there have been times where I have, like they'll say:  "Okay, I don't have the money right now.  Okay, well, you'll have to go and talk to a JetBlue agent.  I mean, there have been times where I have escorted people inside to the counter.  I mean, this is  like families or something like that.

Q.   So you know what to do, if someone comes to the curb and says:  I don't have the money and I don't have a credit card, you know that the protocol is to bring that –

A.   Inside.

Q.   Bring that party inside to figure out how they're going to get their bags paid for or checked, right?

A.   Yes.

Q.   Have you done that?

A.   I have.

Q.   How many times have you done that?

A.   Oh, God, countless.

Q.   So on these certain occasions where you've let people go, why didn't you do that?

A.   The kindness of my heart, I guess.  I mean, people have this thinking of the airlines as, you, all they want are the fees now since these fees have been implemented, and they keep going up and so on and so forth, and I feel for these people.  So in turn, I take it upon myself to compensate.

(McLarty Dep. at 35-37)

Respectfully submitted this 23rd day of June, 2010,

FLIGHT SERVICES AND SYSTEMS, INC.,

By and through its counsel,

/s/ Jeffrey M. Rosin
Ellen C. Kearns
Jeffrey M. Rosin
Christopher M. Pardo
Constangy, Brooks & Smith, LLP
535 Boylston Street, Suite 902
Boston, Massachusetts  02116
Phone: 617.849.7880

1076748.2

## **CERTIFICATE OF SERVICE**

I, Jeffrey M. Rosin, hereby certify that, on this 23rd day of June, 2010, this document was filed through the CM/ECF system and will be sent electronically to the following registered participants as identified on the Notice of Electronic Filing:

Shannon Liss-Riordan, Esq.
Hillary Schwab, Esq.
Lichten & Liss-Riordan, P.C.
100 Cambridge Street, 20th Floor
Boston, Massachusetts 02114

/s/ Jeffrey M. Rosin
Jeffrey M. Rosin

1076748.2